17-7074, Lindsey v. Hyler. Thank you, Chief Judge Temskevich, and may it please the Court, my name is Rusty Smith. This is Ben Baker. Together, we represent the appellants, Kyle Lindsey and Zane Mann. And at the outset, I just want to state, for the reasons you said at the beginning of the testimony, this make-up that we appreciate. Judge Carson will never forget it. I'll never forget it, that's true. The night before Thanksgiving in 2015, Kyle Lindsey and Zane Mann rode on Kyle's Can-Am UTV farm vehicle to the outskirts of Webbers Falls, Oklahoma, a town of about 600 people in eastern Oklahoma. Within the hour, Kyle would be paralyzed, a quadriplegic for life, never to walk, work, or play with his then two-year-old son again. This all happened after a brief interaction with Officer Brandon Hyler of the Webbers Falls Police Department. His life is a living hell, and a jury should determine why this came to be. When the evidence is viewed in a light most favorable to the non-moving parties here, it's clear that a jury could believe that Kyle finds himself in this situation because of the unconstitutional actions of the officer and the unconstitutional policies of this police department. But here, the district court did exactly what Toland v. Cotton said should not be done in these scenarios. It viewed the evidence in a light most favorable to the department, it ignored the totality of the circumstances, and it granted them summary judgment. This, despite testimony from a former Webbers Falls police officer himself, who testified that this department's policy when dealing with a motoring public was to chase them until the wheels fall off and worry about probable cause later. Well, we had probable cause here. We did first, yeah. And there's no question that it was proper for the officer to try to pull over a person evading arrest, right? I'm sorry, I didn't hear the last one. So Mr. Lindsey was evading an arrest and there was a pursuit, right? At some point, your case turns on whether that pursuit becomes unreasonable. I agree with that partially. The only probable cause that we contend, viewing the evidence in a light most favorable to the non-moving parties, would be the initial traffic violation. Did they stop at the stop sign? That's disputed. We have video evidence and testimony from Mr. Lindsey himself that said he stopped. For purposes of this argument, he was in an ATV or UTV on a public road, but did he evade? That's a fact question. If you look at the testimony of the officer himself, all he did was drive out of town. If you view the evidence in a light most favorable to the plaintiff, and I asked this officer, I went down the list in the deposition. Did he turn his lights off? No. Did he speed up, increase his speed dramatically? No. Did he turn off into the woods? No. Did he turn around? No. Did he do anything other than drive away? No. Viewing the evidence in a light most favorable to the non-moving parties, and as the testimony revealed, these boys didn't even know that there was a vehicle behind them. This is a country road at night, it was dark, it's gravel, there's a dust cloud. The dust cloud itself, and this is the probable cause point that I was going to make, Your Honor, in response to the question, the dust cloud itself, if we are to believe the officer's testimony, caused him to terminate the initial pursuit to begin with. If he couldn't see, then how could these boys see? And how could they be evading? So to answer your question, I believe that a jury could find here that this policy of worry about probable cause later, and here's the point in that respect. Once he, this officer initiated a search mission, is what he called it, outside his jurisdiction. For at most a mere traffic misdemeanor. There's no good reason for that. There's no exigent circumstances here. I asked the officer, did you suspect him of committing a felony? Did they commit a felony? No, no, no. All he did was have an ATV on a country road that happens all the time down there in that town. It's not... That's a traffic violation in Oklahoma, isn't it? For purposes of this argument, I will concede to you that it is, but he terminated the pursuit. And then, he went on a search mission outside of his jurisdiction. For what purpose? If you look at the Mosforo case... We're talking about a constitutional argument here, so we're not going to look at officer motive, right? We're looking at an objective situation, not, it doesn't matter whether he had a bad motive or not, right? I would urge the court, let's talk about problem one, because fundamentally, to me, this is a case of municipal liability. I don't say what I'm about to say lightly. I've thought about this. A police department is supposed to protect and serve. They're not supposed to act as a vigilante strike force making money. And I say that, I understand the impact of that. This is a town of 700 people. About 10 years ago, the department was shut down by the state over issues... Is this in the record? It is. How is it relevant to whether there was a constitutional violation for this accident? Because Heiler's actions are the execution of the unconstitutional policy and procedure of the department. He's carrying it out. But we need to have a constitutional violation first. We do. And what was the constitutional violation? There's a fact question as to vehicle contact. Your case turns on vehicle contact. It does. We boil all this down. It does. And the district court did not view the evidence in a light most favorable to the non-moving parties in that respect. Apparently there's some sort of, they applied, or the court applied a standard with our expert witness of absolute certainty. If you read the testimony and the report of Mr. Clevens in its totality as we set forth in our reply, there can be no other conclusions. There was no other vehicle on the road. It was dusty. This vehicle was found covered in dust except for a small part on the bottom right corner that was free of dust. Your expert wouldn't support the argument that there was contact though, did he? I think if you read the totality of his testimony, yes. Where am I going to see the vehicles of the officer's car made contact with the UTV? That specific ultimate issue statement by an expert, I would direct the court to the appendix 638, that's the report of Mr. Clevens, who is one of the leading experts in the state of Oklahoma. I thought in his deposition though he disavowed making a statement that there was direct contact. Am I misremembering that? Well, I think that... I mean, it's fair to say that your expert said that he couldn't say one way or another. He wasn't there. Right. I mean, but that's his job though, right? I mean, you hired him so he could connect it for you because your clients couldn't. I think it's the jury's job. I think that it's the expert's job to show what's more probably true than not. And he goes through every... Right, well, the jury doesn't put on evidence. You've got to put on the evidence. You've got to have somebody who can give the jury facts to rely on. And what all you had was a chase and a flipped over four-wheeler and you needed somebody to say that the officer made contact and caused the accident. Well, we also had actual damage to the UTV in the bottom right-hand side exhibited by photographs. We've got testimony of white paint transfer. We've got a police department who wrote a report that is extremely detailed and talks about the vehicle flipping end-over-end 175 feet. And there's really no damage at all to the UTV except to that bottom right-hand corner and the left front wheel. They didn't quite chase until that wheel fell off, but it is damaged. There's a ton of evidence. He talked about a dust smear, though, didn't he? Correct. And that's visible in the exhibits to the motion for summary judgment. It's clear he went and looked at an exemplar. And he said that it's consistent with contact damage. He went through every single point. Well, there was a question right here, and you can't say with any technical scientific expertise what caused that dust smear true, and then he didn't ever go and put them back together, right? Well, I think if you read the entire deposition transcript, which I don't want to be the entire transcript to the summary judgment record, there can be no other conclusion here. And we've got other testimony as well corroborating that. And plus, again, you have to view the evidence in a light most favorable to the non-moving party. And if we take a hard-line approach to Mr. Blevins' report, who's just trying to do right by an expert witness and not lose credibility by talking about something that he wasn't there to witness, because he's almost, you know, darned if he does and darned if he doesn't, if he says, yes, it contacted, well, you know what the question's going to be. Well, what concerns me is you have a situation where your expert's not willing to say one way or another if that's what happened. I think his testimony is he can't tell if that's what happened. I mean, he has some reasons to believe it's possible. But, I mean, every time there's a possibility that the officer did something, I mean, do we have to then always find a fact question? Well, I don't know that that would necessarily be the case, but that's not what we've got. We don't just have an expert off the street saying this. We've got other evidence. I mean, there was discussion at the scene. You can look at, you can look at the... Is that what you're talking about? Correct. Correct. It held him to an expert standard. I mean, he's a police officer. I mean, I just think that if you view the evidence in a light most favorable to the non-moving parties, that you have to give this testimony and this opinion from Blevins some deference for what it actually says, the entire thing, and not take it out of context. Here's what he said at his deposition. This is Blevins answering a question about this context, page 480 of the record. He says, first of all, you know that I've never put in my report or testified that Hyler's car hit the back of the Can-Am. And then he goes on to say, he was asked, but he says, and you're not going to say it happened. It happened, which was contact. He said, correct. Well, I mean, what do we do? But he also says, I have an opinion, if you'd like to ask for it. And then he goes on and talks about the area being contacted. He said, that is the area, that is that area was contacted during this incident. And then he goes through the list of, that's at 164 to 166, and he goes through the list of everything about all the objective physical evidence there to see. I've got a couple more points to make. I'm running out of time. If that would be. You may reserve your time if you'd like. Do you want to continue this discussion on vehicle contact? Proceed with your argument. Okay. Viewing the evidence in a light most favorable to the non-moving parties, and if we conclude that there is a fact question as to vehicle contact, then obviously intent would be a fact question as well, whether it was a TVI and an intentional spinning out of this vehicle. But, you know, I mentioned a few moments ago that I feel this is a case of municipal liability, and we've got to get there under prong one, whether it's the 4th or the 14th Amendment. The objectively reasonable test, you know, you're talking about chasing a UTV down the road at night, I mean, for nothing other than a couple of small, minor traffic offenses. I don't see how that justifies a search at 60 miles an hour, according to Robbie Baker, who was the first officer on the scene. I mean, this is a fast search. You shouldn't, if the court does the analysis from Allen v. Muscogee and Polly 3, the first prong analysis in Polly 3, I believe, should get us to the underlying constitutional violation and then do the gram factors as well. There's no exigencies. There's no danger to anyone else on the road. Nobody was on the road, but we did have a passenger. The severity of the underlying crime was minimal, and he wasn't evading under our fact scenario. You get the municipal liability. I think that this motivation, traffic fines increased by 231 percent. I had that written down. The jump in traffic fines when this chief got there was astronomical, and this incident is the epitome of this policy in action. I would finally say that with respect to qualified immunity, which I was urged to concede, but I don't give up. Mascaro v. Billings, I think, may get us there as well, because the ultimate holding there is essentially what we've got here. The only difference is they didn't enter into the – can I finish that last sentence? Yeah, please. They didn't enter into a home to search. They started their search out into the country after this gentleman on the road, and I think we request respectfully that this Court reverse and remand the proceeding. Thank you, Counsel. Thank you, and good morning, Your Honors. May it please the Court, Thomas LeBlanc on behalf of Officer Heiler and the Town of Webers Falls. The district court properly and appropriately applied summary judgment standards that have been long established by this circuit and by the U.S. Supreme Court, starting with the very basic principle that to resist summary judgment, the plaintiff has to come forward with admissible evidence that would be sufficient to justify a reasonable jury reaching a conclusion based on that admissible evidence. This standard was reaffirmed very recently earlier this year in McCoy v. Myers, where this Court recognized that the plaintiff's evidence or the non-movement's evidence must be based on, quote, more than mere speculation, conjecture, or surmise, and that unsubstantiated allegations carry no probative weight in summary judgment proceedings. So moving initially... So that doesn't exclude circumstantial evidence, does it? Absolutely not, Your Honor. Circumstantial evidence can be considered if it is presented in an appropriate and admissible fashion. For example, the comments that have been alluded to just a minute ago about Mr. Gilbert's statement that he expressed in his deposition, that Robbie Baker expressed in his deposition, the supposed hearsay statement that Mr. Gilbert claims to have heard somebody ask the question, was there contact on the scene? But he even admits he never heard an answer. Judge at the district court appropriately recognized that inadmissible hearsay, inadmissible lay opinions cannot be considered in deciding a motion for summary judgment. The plaintiff has made a Fourth Amendment claim in this case connected with the pursuit. Brower v. Inyo, Camus Sacramento v. Lewis, and this Court's decision, Grady v. Thomas, are the controlling opinions directly on point. Those cases all establish that in order for there to be a Fourth Amendment claim arising out of a pursuit, a police pursuit, there has to be force intentionally applied by the officer. In other words, as recognized in Scott v. Harris, a more recent U.S. Supreme Court case, it is a true statement that if a police officer uses his vehicle in order to stop a fleeing suspect, that would give rise to a Fourth Amendment analysis. But there are two issues here that are fatally a problem for the plaintiff's Fourth Amendment case. Number one, there is no evidence of contact at all between Mr. Officer Hyler's vehicle and the plaintiff's vehicle. The Court just reviewed the testimony of the plaintiff's expert, Mr. Blevins, who when asked, and the question that gave rise to that answer that was read on page 480, the specific question was, I handed Mr. Blevins a photograph of the front of Mr. Hyler's vehicle, and I handed him a pen, and after all of his talk about possibilities and things that might have been, I very specifically asked him to put an X on the Dodge Charger where you're going to tell the jury that that vehicle made contact with the plaintiff's vehicle. And that's when he gave the answer. In other words, when pressed, is it your professional opinion, after all of your review of this case, that there was contact between these two vehicles? He could not do that. He would not do that. And as the District Court observed in footnote 15 of its opinion, it would be improper to ask the jury to speculate that there was physical contact between the vehicles when the plaintiff's professional accident reconstructionist was unwilling and unable to do that. It is pure speculation. So there is no admissible evidence from which a jury could reasonably conclude that there was any physical contact whatsoever. Therefore, there is no seizure. Therefore, there is no Fourth Amendment violation. But County of Sacramento v. Lewis and Grays v. Thomas takes us a step further and says very clearly, unintentional, accidental, negligent contact. So even if you believe there was physical contact, unintentional, negligent contact does not give rise to a Fourth Amendment violation. At most, it might be a negligence claim, which is not before this Court. And the plaintiff doesn't even argue. Would that create a fact question? Absolutely not, Your Honor. You said if the contact was unintentional, might there be a fact question about whether it was, in fact, intentional? No, Your Honor. In fact, the plaintiff stopped short, even in their pleadings, of even arguing that there was intentional contact. What about imputing intention based on this idea your opposing counsel brought up about the town basically having a policy that when we get one of these folks, we're going to run them down, you know, we're going to chase them down? First of all, that testimony came from a former employee police officer, not from Officer Hiler. There's no evidence that Officer Hiler, who was relatively new, he was a week out of the academy, had ever been told and given that kind of instruction by the chief or anyone else. There's no evidence in the record of other pursuits, significant numbers of pursuits. This was Officer Hiler's first pursuit. There's simply no evidence from which a jury could conclude that this was an intentional contact on the part of Officer Hiler. And, in fact, to the contrary, and it's in the record, Officer Hiler was specifically asked, were you trained on TVI or pit maneuver? The answer was no. Have you ever even seen one? He said, only on TV. He was specifically asked, did you do a pit maneuver? And he testified, no. However, the defendant's law enforcement expert offered his opinion that it would be virtually impossible for an officer of Mr. Hiler's inexperience on a gravel road, at night, in the dust, to execute a pit maneuver on another vehicle. So the jury would have to disregard the evidence that is in the record and reach a purely speculative flip of the coin to say, well, A, we believe there was contact in the absence of evidence, but B, we also believe it was intentional and therefore gives rise to a Fourth Amendment. Isn't intent always have to be inferred? But it has to be inferred from the totality of the circumstances with which you make an inferential case about the issue of intent itself. Absolutely, Your Honor. But the inference has to be drawn from admissible evidence. It can't be drawn from thin air, which is what the jury would have to do here. There simply is no evidence that Officer Hiler knew of some chase-until-the-wheels-fall-off policy or that he intended to exercise an intentional pit maneuver. There's just no evidence of that. So it would be rote speculation and the district court recognized that. The officer apparently didn't turn the lights and siren on during this chase, is that correct? No, Your Honor. That is not the case. And, in fact, it is undisputed that Officer Hiler activated both his emergency lights and his siren in an attempt to make the traffic stop. But not immediately? Officer Hiler contends that as soon as he witnessed the traffic violation, that he activated his overhead lights initially, and then when the UTV continued to accelerate away from him, that is when he activated his siren. And the siren is audible on the 911 call. So there's no dispute, there's no question that there was an audible siren. And there's no dispute and no question that there were overhead lights activated. What the plaintiffs have tried to do is they've attached some kind of blurry photographs from a surveillance camera, the angle of which is not clear, and as the district court observed in its opinion, all you see are points of light. There's no confirmation that what they say is Officer Hiler's vehicle without emergency lights is even his vehicle. Again, this is a speculative, unfounded allegation that the plaintiffs have offered. But even if you accept it, all that tells you is that at that precise point in time, wherever that is, it's not clear from the record that he didn't have his overhead lights activated yet. But there's no question, there's no dispute to his testimony that while they were still on Paved Road, before going on to the overpass over I-40, that Officer Hiler had activated his emergency lights, had activated his siren, and that the plaintiffs were continuing to accelerate. And the plaintiffs themselves, although they said they never heard the siren and never saw the overhead lights, there's also no evidence that they looked back or saw the car without emergency lights activated. And they both testified that in this open ATV, they had music playing on the speakers right behind the seats. That's their explanation for not hearing any siren at any time, was from the noise of the ATV and the music. So again, the plaintiff can't avoid the undisputed evidence that overhead lights were activated and the siren was activated, which gave Officer Hiler probable cause or reasonable suspicion that these UTV drivers were eluding his attempt to make a stop. Put all that together with the record evidence that he actually radioed contemporaneously to 911 to inform them, I'm attempting a traffic stop and they're not stopping. So the jury would have to disregard all of that and then just pull out of thin air. There were no lights. There was no siren. So there's an issue floating around in this case about the 60-mile-an-hour statement. They had someone who was going to testify. They heard the officer say he was going 60 miles an hour, and the district court excluded that, said it was hearsay. Robbie Baker, who arrived after the accident in rather disjointed testimony, said that one of the things he claims Brandon Hiler said at the scene was 60 miles an hour. There's no context for that, Your Honor. And when you read the testimony, it certainly is not an indication that he was going 60 miles an hour on the gravel road during the pursuit immediately preceding the accident. So I think what the district court appropriately recognized was this loose statement, which Robbie Baker claims he heard Brandon Hiler say, is really not material to any of the issues that we're looking at. Well, that doesn't make it inadmissible, though. Didn't the district court rule that that statement was inadmissible hearsay? Well, for Brandon Hiler, I mean, for Robbie Baker to reference that, I think the statement is itself hearsay. The question then would become, I guess under hearsay, is whether or not that could be construed as some admission against interest to avoid the hearsay rule or not. And the district court didn't address that in any detail. But again, even if you assume, OK, that when Brandon Hiler first sees the traffic violation and the UTV is accelerating away from him, if he accelerates to 60 miles an hour to catch up with him to initiate his traffic stop, so what? I don't see how that materially advances the plaintiff's claim in any respect. So I think the district court appropriately recognized that that statement, whether it's hearsay or not, is not a sufficient piece of evidence to avoid summary judgment on either the Fourth or the Fourteenth Amendment. Right. It may, in fact, be irrelevant. I was just curious what your position was on the evidentiary issue. Right. So. So what I say, I've only got a minute left, so I'm going to try to move quickly through this. But but ultimately, what Brower and Sacramento and Thomas versus Grace tell us. And by the way, none of those cases are even addressed by the plaintiff's briefing at all. They're not even cited, not even mentioned. And yet they clearly are the controlling cases. If you're if you're going to argue that, as the plaintiff does here, that the pursuit itself was a Fourteenth Amendment substance of due process violation, the plaintiff has to meet a shock to conscience standard. And you can't look at and say, well, the department is generally a mess, which is what they're trying to do to reach a shock to conscience standard. You first have to show that officer Hyler's conduct shocked the conscience, which gives rise to the Fourteenth Amendment violation. And then you get to look at the municipality for municipal liability. And they fall short of establishing an unconstitutional custom practice or policy as a driving force behind officer Hyler's conduct. And what clearly Sacramento, Graves and Brower tell us is that when it comes to police pursuit, it's only those pursuits with a, quote, purpose to cause harm unrelated to the legitimate object of arrest, which can give rise to a Fourth Amendment claim. That's what this court said in Graves versus Thomas, echoing what the Supreme Court has told us in County of Sacramento versus Lewis. They fall far short of that Fourteenth Amendment standard. I see my time is up, and I appreciate the court's attention. Thank you, counsel. And we didn't have any brew bottle left, did we? Counsel, well stated. Once again, we have a good morning for arguments. We appreciate that. Appreciate your preparation. You are excused, and your case shall be submitted. And the court will be in recess until tomorrow morning, I believe, at 9 o'clock.